STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SARA MILSTEIN (Cal. Bar No. 313370)
Assistant United States Attorney
Violent & Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-8611
     Facsimile: (213) 894-3713
     E-mail:    sara.milstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 19-00700-JAK-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM; DECLARATION AND EXHIBITS |
| v. | |
| JAMES DAVID ROGERS, | Hearing Date: 09/08/2022 |
| Defendant. | Location:    Courtroom of the Hon. John A. Kronstadt |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Sara Milstein, hereby files its Sentencing Memorandum as to defendant JAMES DAVID ROGERS.

//

//

//

This Sentencing Memorandum is based upon the attached memorandum of points and authorities, the declaration of Sara Milstein and attached exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: 8/9/2022                    Respectfully submitted,

                                   STEPHANIE S. CHRISTENSEN
                                   Acting United States Attorney

                                   SCOTT M. GARRINGER
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                        /s/
                                   ─────────────────────────────
                                   SARA MILSTEIN
                                   Assistant United States Attorney

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                        PAGE

TABLE OF AUTHORITIES....................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.....................................1

I.    INTRODUCTION.......................................................1

II.   STATEMENT OF FACTS.................................................1

III.  GUIDELINES CALCULATIONS............................................5

IV.   SPECIFIC OFFENSE CHARACTERISTICS...................................7

      A.    Defendant's Threats Involved the Use of a Dangerous
            Weapon and Involved a Pattern of Stalking....................7

      B.    Defendant Preyed on a Vulnerable Victim......................8

V.    ANALYSIS OF THE SECTION 3553(A) FACTORS............................9

      A.    18 U.S.C. § 3553(a)(1).......................................9

      B.    18 U.S.C. § 3553(a)(2)......................................12

      C.    18 U.S.C. § 3553(a)(6)......................................13

      D.    THE REMAINING 3553(a) FACTORS ALSO SUPPORT THE
            SENTENCE REQUESTED BY THE GOVERNMENT........................13

VI.   CONCLUSION........................................................14

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

Cases

United States v. Hopper,
  27 F.3d 378 (9th Cir. 1994) ........................................ 6

United States v. Medina-Beltran,
  542 F.3d 729 (9th Cir. 2008) ....................................... 6

United States v. Saeteurn,
  504 F.3d 1175 (9th Cir. 2007) ..................................... 13

United States v. Walker,
  665 F.3d 212 (1st Cir. 2011) ....................................... 8

United States v. Yilmaz,
  910 F.3d 686 (2d Cir. 2018) ........................................ 7

Statutes

18 U.S.C. § 3553(a) ............................................. 9, 10

18 U.S.C. § 3553(a)(1) ........................................... i, 9

18 U.S.C. § 3553(a)(2) .......................................... i, 12

18 U.S.C. § 3553(a)(6) ....................................... i, 3, 13

Section 3553(a)(3) ................................................ 13

Rules

USSG § 2A6.2(a) ............................................... 6, 7, 8

USSG § 3A1.1(b)(1) .............................................. 6, 9

USSG § 2A6.2(b)(1)(D) ........................................... 6, 7

USSG §§ 5B1.1, 5C1.1, 5F1.2 ....................................... 13

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

For twelve long years, defendant JAMES DAVID ROGERS ("defendant") terrorized a mother and her child by threatening to torture, rape, and kill them.  His indictment in this case forced defendant out of the shadows and into the light, where he must now face the consequences of his heinous conduct.

**II.   STATEMENT OF FACTS**

In March 2007, defendant began a campaign of torment that he would continue until his arrest in 2019.  Obsessed with Victim 1 and fixated on harming her, defendant learned Victim 1's address and began sending her handwritten letters in which he promised to torture, rape, and kill her.  Defendant signed each letter in the name of the fictional serial killer, Freddy Krueger.[1]  In the year 2007, alone, defendant sent eleven threat letters to Victim 1.  His letters were meant to terrify and intimidate, and defendant succeeded in that aim from the start.  In one early letter from 2007, for example, defendant told Victim 1 that the previous "Mother's Day may be your last.  I have been thinking how I am going to rape and kill you and your daughter. . . .  Maybe I must go see you in Los Angeles."  Ex. A.[2]

In another letter from 2007, defendant said he planned to rape Victim 1 and her daughter, and then "kill you both and chopped [*sic*] your bodies into small peices [*sic*].  I am going to enjoy killing you

---

[1] Sometimes, defendant would spell the first pseudonym "Freddie," or would sign his letters only with his first (fictional) name.

[2] Each lettered exhibit is attached to and incorporated into the Declaration of Sara Milstein, filed herewith.

I hate you and I will destroy you.  I want you to die bitch a most horrible death.  Before you die I want you to watch how I will rape and kill what you treasure most[,] your daughter."  Ex. B.

In 2008, defendant's obsession deepened and broadened in scope. He sent nineteen threat letters, addressing them not only to Victim 1, but also to Victim 1's romantic partner at the time, and to Victim 2, who is Victim 1's minor child.  In these letters, defendant upped the stakes and multiplied his threats.  He wrote to Victim 1, "Maybe if we meet I won't hurt your boyfriend and daughter.  I will see you soon."  Ex. C.  In another letter, defendant taunted, "I am enjoying stalking you.  I am going to instill fear in every part of your life."  Ex. D.  In yet another letter, he wrote, "Your husband will not be able to save you. . . .  You are a weak and vulnerable woman who I am going to take advantage of it [sic]."  Ex. E.

He also directed multiple threat letters to Victim 1's partner. "I am writing to you to tell you to stay away from my woman, [Victim 1].  You need to break it off with her.  I will kill you and [Victim 1].  She belongs to me.  She is my property."  Decl. ¶ 16.

Defendant's threats were relentless -- sometimes, he sent a threat letter just one day after sending the previous one.  Through his incessance and violent rhetoric, defendant lived up to his pledge that "my main mission in life is to stalk you rape you, and terrify you.  I want to make your life so miserable that you can't stand it." Ex. F.  The constant letters gave Victims 1 and 2 no respite from fear that defendant would find them and attack them.

Defendant also made clear that his threats were founded in his genuine intent to act.  He wrote to Victim 1, "You should take me seriously, [Victim 1].  I can do a great deal of damage to you and

2

your precious daughter, [Victim 2].  I would think you would want to stop me for your daughter's safety.  If I get ahold over [sic] her you will be destroyed.  You should be very scared of me. . . .  You're a great target for being raped.  I am looking forward to rape [sic] and kill [sic] you.  I will talk to you soon."  Ex. G.

Defendant's threats impacted the daily lives of his victims.  Victims 1 and 2 moved numerous times in hopes that defendant would not find them again.  They drove circuitous routes home, slept with weapons nearby, and had discussions about how to seek help quickly if defendant found them and tried to harm them.  They tried to anonymize their addresses as much as possible by avoiding receiving mail and packages at their actual address.  To no avail.  Each time they moved, defendant's letters -- and the victims' terror -- would always follow.  And defendant knew it.  "I am back to stalk you," he wrote.  Ex. E.  "I am going to find out where you live and rape you and your daughter.  Your husband will not be able to save you," he went on.  Id.  Once he would find a new address, defendant made sure to let his victims know and continue his threats.  In one letter, defendant wrote, "I have finally found you my dearest whore.  I am going to take my revenge upon you and your daughter [Victim 2].  There will be no place on this earth that I can [sic] find you."  Ex. H.

Defendant's letters to Victim 2, a minor child at the time, were just as disturbing.  In one letter sent to Victim 2's school, he again identified himself as "Freddie Krueger," and "the stalker who forced [Victim 1] out of her house 10 years ago."  Ex. I.  Defendant menaced, "Now I am going to stalk you. . . .  I am going to rape you and make you pregnant with our child. . . .  Then I will kill you and the bitch of a mother you call [Victim 1]."  Id.

3

In the weeks leading up to his arrest, defendant escalated his tactics -- he repeatedly tried to make direct contact with Victim 2 by telephone. On October 23, 2019, defendant called Victim 2's school and claimed to be her father. He asked a school administrative assistant to confirm that Victim 2 was present at school that day, and asked to speak with her. Before Victim 2 could get on the phone, defendant instructed the administrative assistant to have Victim 2 to call him back, and hung up the phone. Victim 2 then spoke with her mother, Victim 1, who contacted Victim 2's real father and confirmed that he had not, in fact, called the school looking for Victim 2. Decl. ¶ 11(a).

The next day, at approximately the same time, defendant called Victim 2's school, asked if she was there, and said he needed to speak with her. On October 30, 2019, at approximately the same time, defendant called the school again. Defendant again identified himself as Victim 2's father and asked to leave a message for Victim 2 before hanging up. Decl. ¶ 11(b).

Then, on or about November 7, 2019, after regular school hours, defendant left a haunting voicemail for Victim 2 by name. He said, "Hello, I want to leave a message for [Victim 2]. This is the man who is gonna rape her, molest her, and kill her. My name is Freddy Krueger. Just let her know. Thank you." Ex. J.

Defendant proceeded to call Victim 2's school five more times on November 11, 2019. Phone records show that defendant called Victim 2's school approximately 18 times in all. Decl. ¶ 11(c).

On November 12, 2019, the FBI arrested defendant. At the same time, they executed a search warrant for his residence and digital devices. They found a cell phone with numerous photographs of

4

Victims 1 and 2 on it, and the cell phone bore the same number as the one that had repeatedly called Victim 2's school.  The call log on defendant's phone listed no recent calls, denoting that defendant had deleted his call history.  Decl. ¶ 11(d).

Prior to defendant's arrest, the FBI performed surveillance on defendant at his place of work, a retirement and assisted living facility.  There, they saw defendant being fully mobile: sitting and standing, walking normally, speaking professionally and coherently, and performing duties without apparent difficulty.  Decl. ¶ 13.

**III. GUIDELINES CALCULATIONS**

On July 22, 2022, the United States Probation Office disclosed the Presentence Report ("PSR") and recommendation letter ("PSA Letter").  (ECF Nos. 50-51.)  The PSR provides the following calculation for the group of related counts leading to the highest offense level, per the United States Sentencing Guidelines, Nov. 1, 2021 ed. ("USSG" or "Sentencing Guidelines"):

//
//
//

```
Base Offense Level         :    18    [USSG § 2A6.2(a)]

Threatened Use of Weapon
and Pattern of Stalking    :   +4     [USSG §§ 2A6.2(b)(1)(D), (E)]

Victim Related Adjustment:     +2     [USSG § 3A1.1(b)(1)]

Multi-Count Adjustment     :   +2     [USSG § 2D1.1(b)(2)]

Acceptance of
Responsibility             :   -3     [USSG § 3E1.1(a), (b)]³

Total Offense Level        :    23
```

PSR ¶¶ 2-31. Accordingly, the government believes that defendant's total offense level is 23. As to defendant's criminal history calculation, the government concurs with the PSR's conclusion that defendant is in Criminal History Category I. The resulting Guidelines range is 46-57 months' imprisonment.

For the reasons stated below, the government asks that the Court impose a 57-month sentence of imprisonment, to be followed by a three-year term of supervised release, and the mandatory special assessments that total $500. The government defers to the PSR's determination that defendant does not have the ability to pay a fine

---

³ The government would ordinarily decline to move for the one-point reduction under U.S.S.G. § 3E1.1(b) in this case because defendant did not "assist[] authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty." U.S.S.G. § 3E1.1(b); see also United States v. Medina-Beltran, 542 F.3d 729, 731 (9th Cir. 2008) (per curiam); United States v. Hopper, 27 F.3d 378, 385 (9th Cir. 1994). Quite the contrary. Defendant did not agree to enter a guilty plea in this case until approximately 2 years and 4 months after indictment, and approximately 1 year and 9 months after a plea agreement was issued and rejected. Defendant's delay is particularly egregious, given that the victims in this case continued to fear for their lives while defendant is released on bond. However, given the unusual circumstances of the pandemic and the unique difficulties it placed on both defendants and their counsel, the government will move for a one-point reduction under § 3E1.1(b) here.

and does not object to a waiver of the fine.  PSR ¶¶ 89-90; PSA Letter at 1.

**IV.   SPECIFIC OFFENSE CHARACTERISTICS**

The PSR recommends the application of specific offense characteristic enhancements to reflect defendant's threatened use of a weapon, his pattern of stalking, and his victimization of a child. The government concurs in these recommendations and respectfully urges the Court to hold defendant to account for these uniquely harmful aspects of his crimes.

**A.   Defendant's Threats Involved the Use of a Dangerous Weapon and Involved a Pattern of Stalking**

The Guidelines provide that the base offense level for stalking, eighteen, may be increased two levels if an offense involved one of five specified aggravating factors, including the "possession, or threatened use, of a dangerous weapon" or a "pattern of activity involving stalking, threatening, harassing, or assaulting the same victim." USSG §§ 2A6.2(a), (b)(1)(D-E).  If the offense involved more than one of the five specified aggravating factors, the district court may increase by four levels.  Id. § 2A6.2(b)(1).  The plain language of § 2A6.2(b)(1)(D) requires either possession or threatened use of a dangerous weapon, indicating that the latter alone is sufficient grounds for the enhancement to apply.  See United States v. Yilmaz, 910 F.3d 686, 688 (2d Cir. 2018) (citing cases).

Comments to the Guidelines define a "dangerous weapon" as:

> (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery

7

to create the appearance of a gun).

Id. § 1B1.1 cmt. n.1(E).

Here, defendant threatened all manner of bodily harm to Victims 1 and 2. These threats included the use of a dangerous weapon, including the one he would use to "kill you both and chopped [*sic*] your bodies into small peices [*sic*]." Ex. B. In another letter, defendant said he would "slit you from throat to pussy." Decl ¶ 14. Although defendant does not specify what type of dangerous weapon he would use to "chop[]" the victims' bodies or "slit" Victim 1's throat, he clearly implied the use of a knife. See United States v. Walker, 665 F.3d 212, 232 (1st Cir. 2011) (referring to appellant's vow to "blow [the victim's] head off" as a "prototypical example" of evidence that "the appellant placed [the victims] in fear of harm through, in part, threats to use a gun").

The Application Notes define a "pattern" as "any combination of two or more separate instances of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction." Id. 2A6.2 app. n. 1. In this case, defendant has conceded he engaged in a years' long "course of conduct" that involved threatening Victims 1 and 2 by letter and voicemail. See ECF No. 38 ¶ 11. This admission, coupled with the fact that he sent scores of threat letters over twelve years and left a threatening voicemail for Victim 2, easily constitutes a "pattern" within the meaning of USSG § 2A6.2(a), (b)(1)(E).

**B.   Defendant Preyed on a Vulnerable Victim**

The Guidelines apply a two-point enhancement "if defendant knew or should have known that a victim of the offense was a vulnerable

8

victim." USSG § 3A1.1(b)(1). The Guidelines define "vulnerable victim" as a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." Id. cmt. 2.

In this case, Victim 2 was a minor at the time he stalked and threatened her, and defendant knew Victim 2 was a minor. Defendant's letters show that he closely stalked Victim 1 for over a decade and knew Victim 1 had a young daughter at the time. He also possessed pictures of Victims 1 and 2 on the cell phone found in his house. And in his various letters to Victim 2, defendant referred to Victim 2's youth, including her virginity, and "rob[bing] her of her innocense [sic]." Decl ¶ 15. He referred to Victim 1 as Victim 2's "mommy," and wrote, "I want you to be very afraid of the boggy [sic] man." Id. In later letters, he noted that Victim 2 had "grown to be a beautiful young woman." Id. And he stalked Victim 2 at her school by mail and telephone, the latter in which he posed as her father to try to gain access to her. All of these facts denote that defendant had actual knowledge of Victim 2's youth and her status as a minor.

**V. ANALYSIS OF THE SECTION 3553(A) FACTORS**

The government submits that the factors set forth at 18 U.S.C. § 3553(a) would be fulfilled by a custodial sentence of no less than 57 months, followed by three years' supervised release.

**A. 18 U.S.C. § 3553(a)(1)**

Section 3553(a)(1) requires the Court to consider the nature and circumstances of the offense, as well as the history and characteristics of defendant. Here, defendant engaged in a 12-year-long campaign that terrorized a mother and daughter and effectively evicted them from their homes each time defendant found them. But

Victims 1 and 2 were not defendant's sole targets; defendant also threatened and stalked Victim 1's romantic partner at the time by sending him threatening letters. The Guidelines actually undercount the scope of defendant's conduct, because they do not account for defendant's threat letters to Victim 1's romantic partner, to whom defendant sent at least two letters with murder threats. See PSR ¶ 31. The unaccounted-for victim of defendant's crimes, as well as the scope and extent of defendant's threats toward Victims 1 and 2, justify the imposition of a high-end sentence here, followed by the maximum term of supervised release.

In mitigation, defendant said in his PSR interview that he had learning difficulties as a child and that his father was unhappy and an alcoholic. See PSR ¶ 47-49. Defendant reported having had a happy respite from these difficulties while he resided with his grandparents before returning to live either one parent or another. Upon his return, he struggled in school, was a social outcast, and was bullied. See id. ¶¶ 50-55. Despite these obstacles, defendant graduated from high school, sought to serve in the military but was discharged, and got an associate's degree. Id. ¶ 56-58.

Defendant now claims that he has difficulty standing and is "barely able to walk." Id. ¶ 65. This representation is highly suspect and should not be used in mitigation. Just a day before defendant's arrest, the FBI performed surveillance on defendant at the retirement and assisted living facility where he worked as a nurse's assistant. There, agents saw a fully mobile defendant: they saw him sitting and standing, walking normally, speaking professionally and coherently, and performing duties without apparent difficulty. Decl. ¶ 13. That defendant was -- and perhaps still is

10

-- able-bodied is consistent with the demands of his job title. The Ohio Department of Job and Family Services provides that nursing assistants "[p]rovide basic patient care under direction of nursing staff. Perform duties such as feed, bathe, dress, groom, or move patients, or change linens. May transfer or transport patients."[4]

The government does not believe that defendant's social or family histories mitigate, justify, or explain his horrific behavior in this case. Nor does it make him less dangerous or capable of reoffending and engaging in threatening behavior anew. Defendant can freely threaten Victims 1 and 2 even if, as he claims, he cannot stand or walk well. Even if this Court credits defendant's statement that he is mobility challenged, the government does not believe this challenge gives this Court cause to sentence defendant below the high-end of the Guidelines, 57 months' imprisonment. Defendant does not deserve this Court's mercy because he showed his victims none. He should not obtain relief as a function of the Court's solicitude for other violators who, unlike defendant, may truly have mitigating reasons for their behavior. This defendant does not.

Defendant's portrayal of himself also stands in stark contrast to the person he represented himself to be through 12 years of threatening letters and calls. Before his arrest, defendant was nurse's assistant employed at a nursing home, where vulnerable elderly and infirmed people reside. PSR ¶ 81. He claims to be the

---

[4] Ohio Dep't of Job & Family Services, Nursing Assistants – 31-1014.00, available at https://jfs.ohio.gov/apprenticeship/program/Nursing-Assistants.stm#:~:text=Nursing%20Assistants%20%2D%2031%2D1014.00%20%7C,of%20Job%20and%20Family%20Services&text=Provide%20basic%20patient%20care%20under,May%20transfer%20or%20transport%20patients (last visited Aug. 8, 2022).

11

caretaker for his elderly mother, who had a stroke.  Id. ¶¶ 60-61. For purposes of the PSR, defendant casts himself to be a mobility-challenged man who cares for others and his mother.  His actual conduct could not be more at odds with those representations.  Not only did agents see him fully mobile and working and walking without difficulty, but defendant made it a point to prey on vulnerable people similar to the ones he claimed to care for.  The government submits that the version of defendant who lives a quiet life and cares for the elderly and infirm is nothing but a mask.  The real defendant is the one he revealed over twelve years of stalking and terrorizing a mother and child.

Defendant's criminal conduct and criminal history are otherwise taken into account in the Guidelines when calculated properly under the government's approach, and a custodial sentence of 57 months is appropriate given these factors.  The government also urges the Court to impose the longest allowable term of supervised release -- 3 years -- to protect the victims and deter defendant from reengaging in stalking or threatening behavior.

**B.   18 U.S.C. § 3553(a)(2)**

Section 3553(a)(2) requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of defendant, and to provide defendant with any needed training and guidance.

These factors also support a custodial sentence of 57 months. If defendant were sentenced to serve any portion of his sentence under house arrest or home confinement, it would give defendant free

rein to re-engage in his stalking behavior.  After all, defendant likely wrote all of his letters, made all of his phone calls, and left his final voicemail all from the comfort of his own home. Allowing him to stay at home would neither serve as punishment, nor would it be an adequate specific deterrent.  In this case, justice requires both, and the Guidelines specifically provide that probation and home confinement sentences are inappropriate for a person like defendant.  See USSG §§ 5B1.1, 5C1.1, 5F1.2.

### C.   18 U.S.C. § 3553(a)(6)

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants.  Using the Sentencing Guidelines to sentence defendant accomplishes this goal. Similarly situated defendants with the same criminal history would likely receive a sentence within the same range.  See United States v. Saeteurn, 504 F.3d 1175, 1181 (9th Cir. 2007) ("Our sister circuits generally agree that 'Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case.'") (citations omitted).  Here, the recommended sentence falls within the applicable Guidelines.  A similarly situated defendant would be subject to the same sentencing range.

### D.   THE REMAINING 3553(a) FACTORS ALSO SUPPORT THE SENTENCE REQUESTED BY THE GOVERNMENT

Section 3553(a)(3) requires the Court to consider the kinds of sentences available.  A 57-month period of imprisonment, followed by a three-year period of supervised release, is a fair sentence, given the scope of harm of defendant's offense, the length of his course of conduct, and the facts that defendant's conduct involved multiple

victims, one of whom was a minor for the extent of his offense conduct, and another of whom (Victim 1's romantic partner) is not accounted for by the Guidelines at all.  The proposed sentence provides punishment that is sufficient but not greater than necessary to address the offense.

Sections 3553(a)(4) & (5) now merely require the Court to take the sentencing Guidelines as "advisory."

**VI.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 57 months' imprisonment, 3 years' supervised release, and $500 total in special assessments.